IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| YOLANDA NKEMAKOLAM, as Parent and Next Friend of K.N., | ) ) ) |
| CHRISTINE STACY, as Parent and Next Friend of N.S., | ) ) ) |
| PATRICK STACY, as Parent and Next Friend of G.S., | ) ) ) |
| DIANE TIMM, as Parent and Next Friend of H.T., | ) ) ) |
| JENNIFER MACTAGONE, as Parent and Next Friend of J.M., | ) ) ) |
| CARIN OBAD, as Parent and Next Friend of Z.O., | ) ) ) |
| MICHAEL KELLY, | ) ) |
| TINA DRAGOVICH, as Parent and Next Friend of C.D., | ) ) ) |
| TIFFANY ALLISON, as Parent and Next Friend of C.U., | ) ) ) |
| JEENA ANDREWS, as Parent and Next Friend of J.A., | ) ) ) |
| JANET TRAYLOR, as Parent and Next Friend of L.T., | ) ) ) |
| and | ) ) |
| JOHN DOES 1-50, | ) ) |
| Plaintiffs, | ) ) |
| v. | ) )   Case No.  12-cv-2132 JWL/KGG |
| ST. JOHN'S MILITARY SCHOOL, | ) ) |

| | |
|---|---|
| **THE DOMESTIC AND FOREIGN** | ) |
| **MISSIONARY SOCIETY OF THE** | ) |
| **PROTESTANT EPISCOPAL CHURCH** | ) |
| **IN THE UNITED STATES OF AMERICA,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **THE EPISCOPAL DIOCESE OF** | ) |
| **WESTERN KANSAS,** | ) |
| | ) |
| **Defendants.** | ) |

## SECOND AMENDED COMPLAINT

Plaintiffs, Yolanda Nkemakolam, as parent and next friend of K.N. ("K.N."), Christine Stacy, as parent and next friend of N.S. ("N.S."), Patrick Stacy, as parent and next friend of G.S. ("G.S."), Diane Timm, as parent and next friend of H.T. ("H.T."), Jennifer Mactagone, as parent and next friend of J.M ("J.M."), Carin Obad, as parent and next friend of Z.O. ("Z.O."), Michael Kelly ("M.K."), Tina Dragovich, as parent and next friend of C.D. ("C.D."), Tiffany Allison, as Parent and Next Friend of C.U. ("C.U."), Jeena Andrews, as Parent and Next Friend of J.A. ("J.A."), and Janet Traylor, as Parent and Next Friend of L.T. ("L.T.")(all Plaintiffs will collectively be referred to as "Plaintiffs"), for their cause of action against Defendant St. John's Military School ("St. John's"), The Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States ("Episcopal Church"), and The Episcopal Diocese of Western Kansas ("Kansas Episcopal Church")(collectively the "Episcopal Church Defendants"), allege and state as follows:

## INTRODUCTION

"Train a child in the way he should go, and when he is old he will not turn from it."

--Proverbs – Ch. 22:6

"When we assumed the soldier, we did not lay aside the citizen."

2

--George Washington

"Leave no man behind."

--U.S. Marine Corp. mantra

St. John's episcopal military school is the antithesis of such valued instructions. The school allows and encourages older students to abuse young students – physically, mentally, emotionally and sexually. Students reporting abuse are "RATS" subject to additional abuse by the school and students for their disloyalty. When concerned parents inquire about injuries to their children, the school responds in lies to cover-up its true culture. This is not a case about mere hazing, or a case of "boys will be boys." This action chronicles a dangerous and disturbing culture at a boys military school which must end.

## THE PARTIES

1.     Plaintiff K.N. is a resident of the State of Texas and resides in San Antonio, Texas. K.N. is a minor, under the age of 18. Yolanda Nkemakolam is the parent and legal guardian of K.N. During portions of the 2011-2012 school year, K.N. was enrolled as a student at St. John's.

2.     Plaintiff N.S. is a resident of the State of Colorado and resides in Broomfield, Colorado. N.S. is a minor, under the age of 18. Christine Stacy is the parent and legal guardian of N.S. During portions of the 2010-2011 and 2011-2012 school years, N.S. was enrolled as a student at St. John's.

3.     Plaintiff G.S. is a resident of the State of Colorado and resides in Broomfield, Colorado. G.S. is a minor, under the age of 18. Patrick Stacy is the parent and legal guardian of G.S. During portions of the 2011-2012 school year, N.S. was enrolled as a student at St. John's.

3

4.      Plaintiff H.T. is a resident of the State of Illinois and resides in Crystal Lake, Illinois. H.T. is a minor, under the age of 18. Diane Timm is the parent and legal guardian of H.T. During portions of the 2011-2012 school year, H.T. was enrolled as a student at St. John's.

5.      Plaintiff J.M. is a resident of the State of California and resides in Auburn, California. J.M. is a minor, under the age of 18. Jennifer Mactagone is the parent and legal guardian of J.M. J.M. was enrolled as a student at St. John's for four days of the 2011-2012 school year.

6.      Plaintiff Z.O. is a resident of the State of Florida but currently resides in a treatment facility in Utah. Z.O. is a minor, under the age of 18. Carin Obad is the parent and legal guardian of Z.O. Z.O. was enrolled as a student at St. John's for the Spring semester of 2010 and the entire 2010-2011 school year.

7.      Plaintiff M.K. is a resident of the State of Tennessee. M.K. was enrolled as a student at St. John's during portions of the 2009-2010 and 2010-2011 school years.

8.      Plaintiff C.D. is a resident of the State of Colorado. Tina Dragovich is the parent and legal guardian of C.D. C.D. was enrolled as a student at St. John's during portions of the 2011-2012 school year.

9.      Plaintiff C.U. is a resident of the State of Texas. Tiffany Allison is the parent and legal guardian of C.U. C.U. was enrolled as a student at St. John's during portions of the 2011-2012 school year.

10.     Plaintiff J.A. is a resident of the State of California. Jeena Andrews is the parent and legal guardian of J.A. J.A. was enrolled as a student at St. John's during portions of the 2009-2010, 2010-2011, and 2011-2012 school years.

11.     Plaintiff L.T. is a resident of the State of Texas. Janet Traylor is the parent and legal guardian of L.T. L.T. was enrolled as a student at St. John's during portions of the 2011-2012 school year.

12.     Defendant St. John's is a Kansas corporation with its principal place of business at 110 East Otis Avenue, Salina, Kansas 67401. The registered agent for service of process is St. John's Military School, 1300 North Santa Fe Avenue, Salina, Kansas 67401.

13.     Defendant The Episcopal Church is a not-for-profit New York corporation. Its principal place of business is 815 2nd Avenue, New York, New York, 10017.

14.     Defendant The Episcopal Diocese of Western Kansas is an unregistered corporation. The registered agent for service of process on The Episcopal Diocese of Western Kansas is the Rt. Reverend Michael Milliken, Bishop of the Episcopal Diocese of Western Kansas, 2 Hyde Park, Hutchinson, Kansas 67502.

## JURISDICTION AND VENUE

15.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds the sum of $75,000 and the parties are citizens of different states.

16.     Venue is proper pursuant to 28 U.S.C. § 1391 as Defendant St. John's is a resident of this district. Furthermore, a substantial part of the events giving rise to the claims brought in this action took place in this judicial district.

## FACTS COMMON TO ALL COUNTS

17.     St. John's is a residential boarding school located in Salina, Kansas.

18.     St. John's houses and allegedly educates students from grades 6 through 12.

19.     St. John's provides housing for its students on its premises.

5

20.     As a residential boarding school for minors, St. John's stands in the position of parents and guardians of students in attendance.  As a result, St. John's has a special "duty" to protect students and to regulate and monitor the behavior of all students.

21.     St. John's represents itself as a military school and at the same time it is affiliated with the Episcopal Church Defendants and a member of the National Association of Episcopal Schools.

22.     St. John's was founded by the Episcopal Bishop Elisha Smith Thomas.  It has an episcopal chapel on campus and an Episcopal Chaplain lives on campus.  All students attend Sunday morning services as well as Wednesday night services.

23.     The Chaplain leads the Chapel Council, a group of students that participate in the liturgical worship of the Episcopal Church.  The Episcopal Chaplain also teaches an ethics class and counsels students at St. John's.

24.     Through the intricate association with St. John's, the Episcopal Church Defendants are aware of and condone St. John's and its practices.

25.     St. John's markets itself throughout the country and, in fact, runs television advertisements in the Denver, Colorado area.

26.     On its website, St. John's boasts it was founded in 1887 and, for over 120 years, the school has been dedicated to the development of young men while maintaining a principal objective to help ensure that children's future lives are filled with success, happiness, and personal fulfillment.

27.     St. John's explains its principal objective is achieved through a rigorous academic environment complemented by a structured campus life, promoting the development of personal

qualities such as personal grace, confidence, respect, high moral character, and leadership that will be indispensable to its students in their future years.

28.     In order to attend St. John's, parents are required to sign a contract with the school which mandates payment of $29,500 per year. The contracted amount is non-refundable regardless of dismissal for cause or voluntary withdrawal.

29.     Although not, in fact, the military, St. John's represents that it "educates" children through a structured military routine.

30.     When children are initially enrolled in St. John's, they begin a six week process known as "New Boy" training. During this process, children are not permitted to talk to anyone and are subjected to significant Physical Training ("P.T.").

31.     After graduating from New Boy, each child is placed into a "company" where they typically reside for the remainder of the school year.

32.     St. John's "structured teaching model" grants students at senior levels (the "Disciplinarians") the authority to discipline New Boys and other low ranking students (the "Younger Boys").

33.     Through this model, St. John's hands over to adolescent students the school's obligation to act as parent to each child enrolled at the institution. These Disciplinarians abuse that power and take their authority beyond any reasonable limits while putting the Younger Boys in constant fear of physical and mental harm.

34.     Because St. John's grants its Disciplinarians the authority to discipline the Younger Boys, it should have heightened security and increased personnel to monitor all activities and protect its children. Yet, in practice, it does quite the opposite.

35.     St. John's students live in dormitories that even its former president called "a terrible place." The dormitories significantly lack monitoring in the form of personnel and cameras. At most, only one adult supervisor remains in the dormitory overnight to monitor the student activities.

36.     By housing students in facilities with minor supervision, St. John's grants its Disciplinarians carte blanche to do what they wish and inflict harm upon the Younger Boys.

37.     St. John's is on notice that abuse occurs throughout the school and has instigated arbitrary and capricious measures to create a false representation that it makes an effort to protect its students.

38.     One of those measures is a bruise check system, a routine where the students are checked for bruises by St. John's staff on a weekly basis. The checks are arbitrary because they take place on the same day each week. If a bruise is found, essentially any excuse for its creation is accepted and, of course, any children that fear the threat of retribution will not inform the school of the individual that abused them.

39.     Although St. John's requests that students inform school personnel if beatings occur, it subsequently tells the Disciplinarians which individual reported the beatings. It is commonly known throughout the school that if a student reports any beatings, he will suffer significant retribution.

40.     Similarly, if a parent contacts the school to discuss concerns regarding physical abuse, the staff will discuss the concerns with the Disciplinarians responsible for caring for the lesser ranked students, a practice which results in additional abuse.

41.     In short, St. John's accepts almost $30,000 per student, hands over its obligations to the Disciplinarians, and turns a blind eye to abuse and ignores cries for help from the Younger Boys.

42.     St. John's allowance of student discipline has resulted in physical harm to its students in the forms of:

        (a) Branding;

        (b) Saber swatting;

        (c) Initiation rituals that include physical beatings with locks, soap and fists;

        (d) Vomiting and physical exhaustion as a result of too much PT; and

        (e) Other physical and mental abuse.

43.     Since the Spring of 2006, St. John's has settled NINE (9) lawsuits related to abuse of its students.

44.     St. John's knew or should have known, through the numerous lawsuits stemming from physical abuse it settled, that the Disciplinarians acted and continue to act in a manner that is physically injurious to others.

45.     St. John's knew or should have known, through the numerous lawsuits stemming from physical abuse it settled, that Plaintiffs would be forced into contact with students who tended to act in a manner that was physically injurious to others.

46.     St. John's knew or should have known, through numerous reports of physical abuse from its students and their parents, that the Disciplinarians are acting in a manner that is physically injurious to others.

47.     St. John's knew or should have known, through numerous reports of physical abuse from its students and their parents, that Plaintiffs would be forced into contact with students who tended to act in a manner that was physically injurious to others.

9

## EACH CHILD'S EXPERIENCE

### J.M.

48.     J.M. attended St. John's for only four days in August of 2011.

49.     On the very first day J.M. attended St. John's, J.M. was pushed from behind while running.  This caused him to fall down multiple times and at some point during the day, his left leg was broken.

50.     J.M. went to the nurse's office multiple times to address the pain in his leg. Rather than giving J.M. proper medical attention, St. John's demanded J.M. continue participating in strenuous PT while J.M. suffered through pain in his left leg.

51.     On the second day, even though J.M. complained of pain in his leg, St. John's demanded J.M. continue participating in PT, which included running on the broken leg.

52.     J.M. returned to the nurse and rather than sending J.M. to the hospital, the nurse wrapped J.M.'s leg and he was told to return to PT.

53.     On the third day J.M. woke up with extreme pain in his left leg, so much so that he could hardly stand when getting out of bed.

54.     Based upon his complaining, J.M. was finally given crutches around lunch time only to have them taken away and returned shortly before dinner time.

55.     Because J.M. was moving so slowly, he was forced to stand in the dining room and be the last to eat dinner.

56.     J.M. was told to hurry up, and was going across the cafeteria when his leg gave out and he fell.  J.M. does not remember the circumstances of the fall, just that he was on the floor.

57.     Rather than helping J.M., the staff and students made J.M. attempt to stand on what was now a broken right leg.

58.     J.M. made an effort to stand (while screaming in pain) but continued to fall down.

59.     Rather than providing J.M. with immediate medical attention, J.M. was picked up by the chest, placed into a chair and told to eat dinner.

60.     After he finished his meal, J.M. was carried outside by his shoulders and thrown on the cement ground.

61.     Once again, rather than getting J.M. necessary and immediate medical attention, the staff and students decided to play with J.M.  They dragged him by his ankles, shaking them wildly, kicked him in the knees, demanded he stand up on his broken legs and threatened to punch him in his mouth if he did not stop screaming.  They drug him by his ankles and threw him over a fence and referred to the area as the Mactagone Zoo and J.M. was told if he was going to act like an animal, they would treat him like one.  All the while, J.M. was suffering from two broken legs.

62.     After their needs were filled, the staff and students stuffed J.M. into a shopping cart and returned to his dorm room.  Different staff and students visited him to tell him he was weak and others were tougher than him and what was eventually going to happen to him.

63.     Eventually, his mattress was put on the floor in his dorm room, and he was dumped from the shopping cart they used to transport him onto the floor.  J.M. eventually made it to the mattress and was able to get his upper body on it.

64.     The next morning J.M. was found on his urine covered floor, he was yelled at and told to stand again.  After explaining he could not stand up, he was put in a chair and rolled to

the nurse's office.  While waiting to see a nurse, it was, finally, at this point when an ambulance was called.

65.     J.M. was taken to the hospital where X-rays revealed J.M. had two broken legs. The X-ray reflects J.M. was abused so badly that the bone was displaced several inches below the knee.

66.     J.M.'s parents were finally contacted by Captain Reid and informed that their son had two soft tissue knee injuries and he asked if their son had incontinent issues.

67.     J.M. was forced to undergo emergency surgery to repair his legs.

68.     After a week in the Salina hospital, J.M. was life-flighted back to his home State of California where he spent an additional two more days in the hospital.

**K.N.**

69.     K.N. attended St. John's during the Spring semester of 2011.

70.     While attending St. John's, K.N. was subjected to significant physical and mental abuse including the following:

(a) In one incident, K.N. was bound, gagged and beaten by multiple students. The students took pictures of the event and posted them to Facebook.

(b) K.N. was randomly assaulted by multiple students for inconsequential reasons.

(c) K.N. was locked into a locker, slammed around while in the locker and left in it for over 30 minutes.

(d) K.N. was forced to get into his uniform, roll around in mud and then discard all of his clothes.

(e) K.N. was urinated on by other students while in the shower.

(f) K.N. was bullied into purchasing food for other students and was afraid to sleep at night for fear that other students would steal his personal belongings or demand he awake to perform PT.

71.     During his stay at St. John's, K.N. told his parents of the conditions and abuse. K.N.'s parents contacted the school on multiple occasions to discuss the situation.

72.     Every time the issues were presented to the school, the school informed K.N.'s parents that he was doing just fine and he was making up stories in hopes of leaving the school.

73.     On multiple occasions, K.N.'s parents contacted Sgt.Maj. Jerry Nichols, the Director of Cadet Life. Each time, Nichols informed K.N.'s parents that everything was fine with K.N. and he was making up stories. On the final phone call to Nichols prior to Thanksgiving break, Mr. Nichols became upset and exclaimed "it pisses me off that he is bothering you guys like this!"

74.     In December, K.N. approached the school president to inform him of the abuse he was suffering to which the president inquired whether K.N. suffered from a mental problem.

75.     Since leaving St. John's, K.N. has suffered from an inability to sleep as a result of constant nightmares and has been diagnosed with Post-Traumatic Stress Disorder ("PTSD") as a result of the abuse he suffered while attending St. John's.

76.     In order to function, K.N. must take medication.

77.     K.N. incurred and continues to incur medical expenses as a result of the abuse.

78.     Additionally, because St. John's has refused to release K.N.'s transcripts, K.N. will be forced to redo the 11th grade starting in the Fall of 2012.

<u>N.S.</u>

79.     N.S. attended St. John's during the 2010-11 school year and returned for the 2011-12 year, but was ultimately dismissed in January of 2012.

80.     N.S.'s life was threatened by another student on the first day he arrived at St. John's.

81.     While at St. John's, N.S. was the victim of multiple beatings at the hands of certain students.

82.     N.S. was physically beaten for things such as leaving his room during study hall or for having tobacco in his room.

83.     The beatings came in the form of violent blows to the head or punches to the body in order to avoid areas that could be seen during a bruise check.

84.     While attending St. John's, N.S. witnessed children attempt to commit suicide and, on one occasion, an attempted rape.

85.     N.S. reported the situation to his parents but requested his parents not contact the school because it was common knowledge that if someone reported something, the student would be beaten worse the next time.

## G.S.

86.     G.S. attended St. John's for the Fall semester of 2011 and returned for just a short period in the Winter of 2012 before being dismissed.

87.     While at St. John's, G.S. witnessed beatings take place on daily basis.

88.     While at St. John's, G.S. was forced at any hours of the day to participate in PT to the point of vomiting.

89.     After deciding he did not want to stay at St. John's any longer, G.S., along with another student, left the school and attempted to hitch-hike back to Colorado.

90.     Upon realizing the students' absence, the Commandant of the school organized students in the Advanced Military Skills ("AMS") group, put them on a bus and searched for G.S.

91.     G.S. was found on the highway.   Upon being found, G.S. was beaten by the students.   When G.S was placed on the bus, other students put his hood over his head and repeatedly slammed his head into the seat in front of him.

92.     The Commandant who was driving the bus witnessed the beating, allowed the beating to occur, and refused to intervene.

93.     Upon exiting the bus, G.S. was told by the Commandant that he did not see anything.   Subsequently, G.S.'s backpack was dumped out, water was poured upon him, his shoes were tied together and he was forced to stand at attention for an hour.

94.     G.S.'s experience at St. John's has had a traumatic affect upon him.

## H.T.

95.     H.T. attended St. John's from October 2011 through December 2011.

96.     While attending St. John's, H.T was the victim of multiple beatings and suffered from extreme abuse.

97.     Rather than being granted the right to eat, on many occasions H.T. was pulled out of meal time to participate in strenuous PT to the point of vomiting or absolute exhaustion.

98.     When H.T. returned home for Thanksgiving, he had visible bruises upon his face.

99.     The bruises were a result of an incident where several students entered H.T.'s room with the intent to lock him into a locker.

100.    Rather than getting locked in the locker, H.T. defended himself and, as a result, was significantly beaten by the students.

101.    In a separate incident occurring on the evening of December 8, 2011, H.T. was in his room when a senior ranking student entered.

15

102.   While H.T. was standing at parade rest (hands behind his back), the senior ranking student began interrogating H.T. about a bag of laundry.  Within seconds, the student took H.T.'s head and slammed it against his knee.

103.   Rather than receiving proper medical attention at the time, St. John's staff did nothing more than contact H.T.'s parents to represent H.T. "had been in a fight" and that he would go to the nurse's office in the morning.

104.   When his injuries were finally addressed the next morning, H.T. was sent to the hospital because he suffered a fractured orbital socket as a result of the knee to the head.  Prior to flying home for the holidays, H.T. was forced to see an eye specialist due to an increased risk of pressure in his eye potentially resulting in permanent vision loss.

105.   Even though physical violence is grounds for expulsion at St. John's, the student that broke H.T.'s orbital socket was not expelled.

106.   Well prior to December 8, 2011, H.T.'s parents had contacted the school with concerns regarding abuse.

107.   On October 17, 2011, H.T.'s parents contacted Sgt. Maj. Jerry Nichols to discuss the things they had heard from H.T. and observed at parent's weekend.  The response was that it was common for boys to tell stories to make their parents feel sorry for them and he represented that St. John's does not condone such physical beatings.  Nichols represented he would look into the issue, but never contacted the parents again.

108.   H.T. incurred and continues to incur medical expenses as a result of the abuse.

**M.K.**

109.   M.K. attended St. John's from October 2009 until November 2010.

110.    During his time at St. John's, M.K. suffered from multiple methods of abuse.

111.    Shortly after enrolling at St. John's, M.K. was forced to share a room with a known sexual predator.

112.    As a form of initiation upon graduating from New Boy, M.K. was held down against his will and branded on his stomach.

113.    On multiple occasions M.K. was whipped with wet towels while attempting to shower.

114.    M.K. was also the victim of saber swats.

115.    Throughout his tenure at St. John's, M.K. was constantly in fear for his safety and being forced to endure inhumane PT and many of his personal items were stolen.

116.    On one occasion, M.K. was taken into a stairwell by six students. The students beat him and attempted to throw him down the stairs.

117.    On yet another occasion, M.K. was taped, bound and gagged.

118.    Shortly after arriving at St. John's, M.K. was prescribed anti-depressant medication to assist him in on a daily basis.

119.    During his time at St. John's, M.K.'s condition worsened and he developed a habit of self-mutilation to cope with the environment.

120.    Ultimately, upon returning from Thanksgiving Break in 2010, M.K. attempted to commit suicide by ingesting a lethal amount of prescription medication. He was rushed to the hospital where he regained consciousness.

121.    M.K. never returned to St. John's.

122.    While at St. John's, M.K.'s parents contacted St. John's on multiple occasions to discuss M.K. and allegations of physical abuse.  St. John's either did not respond to the parents or simply stated M.K. was doing fine.

## Z.O.

123.    Z.O. attended St. John's from January 2010 through the end of the 2011 school year.

124.    While a student at St. John's, Z.O. was the victim of continued physical and emotional abuse.

125.    While a New Boy, seven boys entered Z.O.'s room while he was asleep and beat him with socks that contained what appeared to be pad locks.

126.    He had items stolen from his room and when reported, he would be told to keep looking.

127.    On one occasion, Z.O. was forced to endure significant PT.  During the PT, he did strenuous physical exercises.  He was then taken to the cafeteria and forced to eat shredded cheese and drink several glasses of water.  After consuming the food and drink, he was forced to continue the PT until he threw up several times.

128.    Z.O. was saber swatted on multiple occasions by other students and he was "chocked out" by another student.

129.    On another occasion, Z.O. was taken to the weight room in his dorm building and forced to run on a treadmill in full sweats and a coat.  He was beaten while he ran to the point of exhaustion.  He was then told to run the stairs in the building and he was kicked down the stairs. While on the ground, he was threatened with his life to remain silent about the event.

130.    The very next day, Z.O. was taken to a room off of the basketball court and beaten again. He had his hood tied over his eyes and some students attempted to choke him to the point of passing out. After being beaten, he was forced to sit square with a 45 pound weight that eventually dropped on his foot.

131.    Just before Summer Break of 2010, a student with a history of sexual abuse approached Z.O. and attempted, in a sexual manner, to grope him. Z.O. was forced to fight him off, but the perpetrator followed Z.O. into his dorm room where the fight ensued.

132.    Z.O. ultimately fought off the student, but hurt his hand in the altercation.

133.    Z.O. went to the nurse for her to inspect his hand because he thought it was broken. While there, Z.O. informed the nurse of the encounter and that it occurred as a result of an attempted sexual assault.

134.    The nurse contacted Z.O.'s parent and informed her only that Z.O. was in a fight and that she may want to have someone else look at Z.O.'s hand when he returned home.

135.    When Z.O. returned home, he was taken to a doctor and told his hand was broken.

136.    The school did not investigate the sexual abuse allegations, charge the perpetrator or even inform Z.O.'s parents of the allegations.

137.    As a result of attending St. John's, Z.O. became afflicted with an addiction to drugs that did not exist prior to his admission.

138.    Z.O. is a shadow of the child that was sent to St. John's.

139.    Because of his addiction and his actions, Z.O. was admitted to a treatment facility where he remains today.

140.    Z.O.'s medical providers are forced to medicate Z.O. so he can sleep and control his anger. He has been diagnosed with Post Traumatic Stress Disorder and his therapist,

psychiatrist and psychologist have advised that Z.O. will require years of therapy to recover from his experiences at St. John's.

141.    Z.O.'s mother contacted St. John's on multiple occasions while he attended St. John's inquiring about his grades as well as when he reported he was being physically beaten. On the few occasions that St. John's did respond, it advised Z.O. was not suffering from any abuse, but most of the time the communications were ignored.

## J.A.

142.    J.A. began attending St. John's in 2009.  He was 11-years old when he was enrolled.

143.    While a student at St. John's, J.A. suffered mental trauma and physical abuse.

144.    J.A. was saber swatted multiple times while taking a shower.

145.    J.A. was forced to endure significant PT and while performing PT he was kicked and punched.

146.    During his second year at St. John's, J.A. was approached by a student that lived next door to him.  The student informed J.A. that he was just forced to perform oral sex upon an older enrolled student.

147.    At the age of 13, even though still an 8th grader, J.A. was moved from the grade school barracks to the high school barracks.  When moved up, he was picked on excessively and subjected to significant abuse in the form of punching and kicking, as well as mental taunting.

148.    J.A. complained to his parents on numerous occasions.

149.    J.A.'s parents contacted the school many times to discuss allegations related to the alleged abuse.

150.     St. John's consistently denied J.A. was the victim of abuse and represented that it was keeping its eyes on J.A. to make sure he remained safe at the school.

151.     It further informed the parents that no such abuse could possibly be going on at the school.

152.     J.A. was withdrawn from the school in March of 2012.

## L.T.

153.     L.T. attended St. John's for portions of the 2011-2012 school year.

154.     While a student at St. John's L.T. was the victim of physical and mental abuse.

155.     Within a few weeks of being enrolled at St. John's, three older boys with higher ranks came into L.T.'s room.   After instructing his roommate to leave, the boys began antagonizing L.T. by pushing him around and threatening to hit him.

156.     An adult staff member walked past L.T.'s room, looked into the window, but continued to walk on.

157.     Because he was in fear for his safety and wanted help, L.T. punched his arm through the window.

158.     The glass sliced his arm and he was forced to go to the hospital and undergo surgery.

159.     On another occasion, L.T. witnessed a student enter another students room and steel some nicotine drops.   L.T. reported this to some higher ranking cadets, but nothing was done.

160.     L.T. was then beaten by the student that stole the nicotine drops and one other student. The beating included being punched on the head.

161.    L.T. reported the abuse he endured to the staff.  The only punishment was to write a letter of apology.

162.    After Christmas break, L.T.'s room was not clean.  As a result, two students entered his room and began punching him in the face.  L.T. went to the hospital as a result of the abuse.

163.    The students informed the staff that L.T. began the altercation and nobody was punished.

164.    While at St. John's, L.T. was also subjected to sleeping in the hallway in underwear without blankets or pillows as and doing naked pushups in the showers while adults watched.

165.    St. John's consistently failed to give L.T. the prescription medications he was required to take.  By constantly taking him on and off his medication, St. John's put L.T. on a mental roller coaster.

166.    As a result of the abuse L.T. suffered in addition to St. John's failure to properly provide his medication, he was taken to the hospital yet again.

167.    Because of St. John's complete inability to care for L.T. and keep him safe, L.T. was withdrawn from St. John's.

<u>**C.U.**</u>

168.    C.U. attended St. John's from August of 2011 until April 17, 2012.

169.    While a student at St. John's, C.U. was the victim of physical abuse in multiple forms.

170.    Upon graduating from new boy training, he was subjected to an initiation ritual known as "Rat Tails." An event where students come into your room in the middle of the night and hit you with wet towels tied up by boot bands that have exposed metal ends.

171.    C.U. was forced to play a game called "Rat Ball." A game that's encourages violence because its primary goal is to force students to beat each other up in an effort to get a ball.

172.    While a student at St. John's, C.U. was subjected to excessive PT. He was forced to exercise for up to six hours a day on weekends and four to five hours a day during the week.

173.    C.U.'s life was put in danger during the PT sessions because he was denied the right to medical care which included his asthma medication. The continued denial of medication ultimately led to C.U. being placed in the infirmary with pneumonia.

174.    After this lawsuit was initially filed, C.U. continued to be subjected to strenuous PT at St. John's. On April 6, 2012, C.U. was suffering from extreme pain as a result of constant PT. He sought medical attention, however, St. John's refused to allow him to see an orthopedic doctor to address his concerns related to pain in his knee.

175.    During Easter weekend, C.U. was locked in his room with his roommate in extreme pain and not provided with any appropriate pain medication.

176.    C.U.'s mother sought to send him a pizza, but St. John's denied the request.

177.    Due to the fact that he was in pain and not receiving the proper medical treatment, C.U. was withdrawn from St. John's in April of 2012.

### C.D.

178.    C.D. attended St. John's from January 2, 2012 until April 6, 2012 and suffered significant abuse while enrolled.

23

179.   C.D. also had personal belongings stolen from him, including an iPod. When he reported any theft, St. John's made no effort to assist.

180.   C.D. was jumped in the bathroom multiple times while doing "duties" in the bathroom.   Duties include scrubbing the bathroom floors and toilets.   C.D. was beaten with various objects and the Disciplinarians intentionally hit him in areas that could not be seen in bruise checks.   If bruises were seen, out of fear C.D. would claim he received them while playing a sport.

181.   C.D. did not tell any adults about these events for fear of suffering retribution.

182.   After this lawsuit was filed, C.D.'s abuse did not stop.

183.   On April 3, 2012, C.D. informed St. John's staff that he was constantly beaten and he was afraid for his safety.   He told the staff exactly who beat him and when he was beaten.

184.   That evening, he contacted his mother, told her everything he told St. John's staff, and asked his mother to come pick him up.   C.D.'s mother spoke with Mr. McGee at St. John's and informed him she would pick C.D. up on the evening of April 4, 2012.

185.   Mr. McGee admitted some kids in the company were causing problems and that C.D. was being singled out.   He acknowledged C.D. would be picked up the next day.

186.   On the morning of April 4, 2012, C.D.'s mother received a phone call from England at 8:30 a.m.   England told C.D.'s mother that he had spoken with C.D. and he would handle the situation.   England promised C.D.'s mother that there would be an investigation into all of the alleged abuse and that he was proud of C.D. for speaking up.   England also promised C.D.'s mother that C.D. would be protected.

187.   England assumed an affirmative duty to specifically make sure nothing happened to C.D. as a result of telling the President and other staff at St. John's the abuse that he suffered.

188.     After this conversation, C.D.'s mother agreed not to withdraw C.D. from St. John's because she understood C.D. was safe and the situation would be addressed.

189.     That night, on April 4, 2012, C.D. was taken into the bathroom and held down against his will by two St. John's students while a third branded his arm with a private rank.  A picture of the brand is attached hereto as Exhibit D.

190.     The next evening, C.D. spoke with his mother and told her of the brand.  C.D. was withdrawn on April 6, 2012.

### ST. JOHN'S ACTIONS SINCE FILING OF THE SUIT

191.     After this suit was filed, St. John's and its staff abused its authority and power over its students in an effort to destroy relevant video and photographic evidence.

192.     Many students throughout St. John's videotaped and photographed the abuse that occurred.  The information primarily remained on the cell phones that took the pictures or videos.

193.     Only a few days after the suit was filed, St. John's President, Mr. England, addressed all the students in the cafeteria and affirmatively ordered them to delete any and all videos and pictures that could be related to this lawsuit off their cell phones.

194.     Many students complied with the demand, yet others did not.

195.     St. John's then took matters into its own hands.

196.     During the week of April 23, 2012, St. John's reviewed the photos and videos contained on its student's cell phones.  It did so by ordering the students present the cell phones at a bruise check and have the student type in any necessary pass codes.

197.     After getting to the information, the staff deleted any videos or pictures that could be related to the lawsuit.

## COUNT I
## NEGLIGENT SUPERVISION BY ST. JOHN'S

198.   Plaintiffs incorporate each and every allegation contained in numbered Paragraphs 1 through 199 above and make the same a part hereof as if fully set forth herein.

199.   St. John's acts in *loco parentis* with respect to its students.  As such, St. John's had a duty to control the conduct of the students who physically harmed Plaintiffs so as to prevent them from doing such harm and to protect Plaintiffs against unreasonable risks of harm.

200.   In failing to properly supervise and/or otherwise control the conduct of its students, St. John's breached its duty.

201.   St. John's breach of its duty to control the conduct of its students was the cause-in-fact and proximate cause of each Plaintiff's injuries.

202.   Each Plaintiff suffered and continues to suffer his own distinct damages as a result of St. John's negligence in the form of medical bills, psychiatric bills, rehabilitation costs, pain and suffering and other damages.

203.   St. John's is liable for each Plaintiff's damages.

WHEREFORE, each Plaintiff respectfully request the court enter judgment in his favor against St. John's in an amount in excess of $75,000.00; that the costs of this action be assessed against St. John's; that the Court grant punitive damages against St. John's; and, that the Court grant such other and further relief as it deems fair and equitable in the circumstances.

## COUNT II
## NEGLIGENT SUPERVISION BY THE EPISCOPAL CHURCH DEFENDANTS

204.   Plaintiffs incorporate each and every allegation contained in numbered Paragraphs 1 through 203 above and make the same a part hereof as if fully set forth herein.

205.    The Episcopal Church Defendants, the very entity that created the school, have a physical presence at St. John's through the presence of a Chaplain and a chapel, yet they make no effort to supervise and protect the students.

206.    By being present and representing their influence over the institution on St. John's web site and through media and other sources, the Episcopal Church Defendants know of their duty to control and supervise St. John's and they affirmatively represent to the Plaintiffs they will oversee and protect them.

207.    By failing to supervise and/or otherwise control the conduct of St. John's and its students, the Episcopal Church Defendants breached their duty to Plaintiffs.

208.    Each Plaintiff suffered damages as a result of this failure to supervise.

209.    The Episcopal Church Defendants are therefore liable to each Plaintiff and for the damages he incurred.

WHEREFORE, each Plaintiff respectfully requests the court enter judgment in his favor against the Episcopal Church Defendants in an amount in excess of $75,000.00; that the costs of this action be assessed against Episcopal Church Defendants; for punitive damages; and, that the Court grant such other and further relief as it deems fair and equitable in the circumstances.

## COUNT III
## ST. JOHN'S INTENTIONAL FAILURE TO SUPERVISE

210.    Plaintiffs incorporate each and every allegation contained in numbered Paragraphs 1 through 209 above and make the same a part hereof as if fully set forth herein.

211.    St. John's acts in *loco parentis* with respect to its students.  As such, St. John's had a duty to control the conduct of the students who physically harmed each Plaintiff and to prevent them from doing the harm and protect each Plaintiff against unreasonable risks of harm.

212.    St. John's knew of its duty to control its students and was aware of the dangerous propensities of some of its students.

213.    By intentionally failing to supervise and/or otherwise control the conduct of its students, St. John's nurtures and promotes the violent atmosphere and as such breached its duty.

214.    Each Plaintiff suffered damages as a result of St. John's failure to supervise its students.

215.    St. John's is therefore liable for each Plaintiff's damages.

WHEREFORE, each Plaintiff respectfully request the court enter judgment in his favor against St. John's in an amount in excess of $75,000.00; that the costs of this action be assessed against St. John's; for punitive damages; and, that the Court grant such other and further relief as it deems fair and equitable in the circumstances.

**COUNT IV**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS or OUTRAGE**

216.    Plaintiffs incorporate each and every allegation contained in numbered Paragraphs 1 through 215 above and make the same a part hereof as if fully set forth herein.

217.    St. John's through its conduct acted intentionally or with reckless disregard of the possibility of causing emotional distress to each Plaintiff by placing each Plaintiff in close proximity with persons in its custody whom it knew acted in a manner that was physically injurious to others and further by failing to supervise or control the conduct of those persons.

218.    St. John's conduct as outlined in the paragraphs above was also extreme and outrageous.

219.    St. John's conduct was the cause-in-fact and proximate cause of each Plaintiff's emotional distress.

220.   As a result of St. John's conduct, each Plaintiff suffered severe and extreme emotional distress.

221.   Therefore, St. John's committed the tort of Intentional Infliction of Emotional Distress against each Plaintiff, and is liable to Plaintiffs for compensatory as well as punitive damages.

WHEREFORE, each Plaintiff respectfully requests the court enter judgment in his favor against St. John's in an amount in excess of $75,000.00; that the costs of this action be assessed against St. John's; for punitive damages; and, that the Court grant such other and further relief as it deems fair and equitable in the circumstances.

## COUNT V
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

222.   Plaintiffs incorporate each and every allegation contained in numbered Paragraphs 1 through 221 above and make the same a part hereof as if fully set forth herein.

223.   St. John's acts in *loco parentis* with respect to its students. As such, St. John's had a duty to control the conduct of the students who physically harmed each Plaintiff so as to prevent them from doing such harm and to protect each Plaintiff against unreasonable risks of harm.

224.   In failing to properly supervise and/or otherwise control the conduct of its students, St. John's breached its duty.

225.   St. John's, through its conduct and omission, acted with disregard of the possibility of causing emotional distress to each Plaintiff by placing each Plaintiff in close proximity with persons in its custody whom it knew acted in a manner that was physically injurious to others and further by failing to supervise or control the conduct of those persons.

226.   St. John's conduct as outlined in the paragraphs above was also extreme and outrageous.

227.   St. John's conduct was the cause-in-fact and proximate cause of each Plaintiff's emotional distress.

228.   As a result of St. John's conduct, each Plaintiff suffered severe and extreme emotional distress.

229.   Therefore, St. John's committed the tort of Negligent Infliction of Emotional Distress against each Plaintiff, and is liable to each Plaintiff for compensatory as well as punitive damages.

WHEREFORE, each Plaintiff respectfully requests the court enter judgment in his favor against St. John's in an amount in excess of $75,000.00; that the costs of this action be assessed against St. John's; for punitive damages; and, that the Court grant such other and further relief as it deems fair and equitable in the circumstances.

## COUNT VI
## BREACH OF FIDUCIARY DUTY

230.   Plaintiffs incorporate each and every allegation contained in numbered Paragraphs 1 through 229 above and make the same a part hereof as if fully set forth herein.

231.   As a boarding school St. John's and the Episcopal Church Defendants have a duty to act in *loco parentis* to the students, giving rise to a fiduciary duty.

232.   By failing to supervise the students and allowing each Plaintiff to be beaten, Defendants breached their duty to each Plaintiff.

233.   Defendants breach of their duty to supervise and control the conduct of the students was the cause-in-fact and proximate cause of each Plaintiff's injuries.

234.   Each Plaintiff suffered damages as a result of the Defendants' breach.

WHEREFORE, each Plaintiff respectfully requests the court enter judgment in his favor against all Defendants in an amount in excess of $75,000.00; for punitive damages; that the costs of this action be assessed against all Defendants; and, that the Court grant such other and further relief as it deems fair and equitable in the circumstances.

**COUNT VII**
**CIVIL CONSPIRACY OF ASSAULT AND BATTERY**

235.    Plaintiffs incorporate each and every allegation contained in numbered Paragraphs 1 through 234 above and make the same a part hereof as if fully set forth herein.

236.    St. John's acts in *loco parentis* with respect to its students. As such, St. John's had a duty to control the conduct of the students who physically harmed each Plaintiff so as to prevent them from doing such harm and to protect each Plaintiff against unreasonable risks of harm.

237.    The Discipliners were entrusted by St. John's with the duty of physically training and disciplining the Younger Boys, including each Plaintiff.

238.    The Discipliners, at the direction and, in at least one instance, under the observation of St. John's and its employees, attempted and succeeded in causing physical contact with each Plaintiff.

239.    The Discipliners, at the direction and, in at least one instance, under the observation of St. John's and its employees, attempted and succeeded in causing the immediate apprehension of physical contact in each Plaintiff.

240.    The attempts to physically injure and physical contact with each Plaintiff were unlawful and unjustified.

241.    As a result of such attempts, each Plaintiff sustained injuries.

242.    The Discipliners, at the direction and, in at least one instance, under the observation of St. John's and its employees, committed assault and battery upon each Plaintiff.

243.    St. John's did wrongfully conspire with certain students to commit assault and battery upon each Plaintiff.

244.    St. John's conspiracy was the cause-in-fact and proximate cause of each Plaintiff's injuries.

245.    Each Plaintiff suffered damages as a result of the conspiracy.

WHEREFORE, each Plaintiff respectfully requests the court enter judgment in his favor against St. John's in an amount in excess of $75,000.00; for punitive damages; that the costs of this action be assessed against St. John's; and, that the Court grant such other and further relief as it deems fair and equitable in the circumstances.

### JURY DEMAND

Plaintiffs, request a jury trial on all issues so capable of being tried, including punitive damages, as they are entitled pursuant to their Seventh Amendment Constitutional rights.

### DESIGNATION OF PLACE OF TRIAL

Plaintiffs hereby designate Kansas City, Kansas as the place of trial in this case.

Respectfully submitted,

**MILLER SCHIRGER, LLC**

/s/ Daniel R. Zmijewski
Daniel R. Zmijewski, KS # 21275
Joseph M. Feierabend, KS #78350
4520 Main Street, Suite 1570
Kansas City, MO 64111
P: 816-561-6500
F: 816-561-6501
E: dzmijewski@millerschirger.com
E: jfeierabend@millerschirger.com
ATTORNEYS FOR PLAINTIFFS

32

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2012, the foregoing was elctronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the attorneys listed below, and a copy was also sent via U.S. Mail to:

John G. Schultz
Derek Johannsen
Franke Schultz & Mullen, P.C.
8900 Ward Parkway
Kansas City, MO 64114
P: (816) 421-7100
F: (816) 421-7915
E: jschultz@fsmlawfirm.com
E: djohannsen@fsmlawfirm.com
Attorneys for Separate Defendant
St. John's Military School

Timothy J. Finnerty
Wallace, Saunders, Austin, Brown
 & Enochs, Chtd.
400 O.W. Garvey Center
200 West Douglas
Wichita, KS 67202
P: (316) 269-2100
F: (316) 269-2479
E: tfinnerty@wsabe.com
Attorneys for Defendant The Episcopal
Diocese of Western Kansas

Paul D. Satterwhite
Wade M. Early
Husch Blackwell LLP
901 St. Louis Street, Suite 1800
Springfield, MO 65806
P: (417) 268-4000
F: (417) 268-4040
E: paulsatterwhite@huschblackwell.com
Attorneys for Defendant The Domestic and Foreign Missionary Society of the
Protestant Episcopal Church in the United States of America


/s/ Daniel R. Zmijewski
ATTORNEY FOR PLAINTIFFS